Zoss and we'll hear from Mr. Thompson. Good morning your honors. Mike Thompson Jr. from the law firm of Wright and Greenhill in Austin and today I represent three police officers who have been sued claiming they used excessive force making an arrest involving William Slade Sullivan back in March of 2014. Together my clients have over 30 years of law enforcement experience and I'm pleased to represent them here today. My clients are entitled to qualified immunity because despite the tragic consequences in this case they used measured and ascending actions and applied a reasonable amount of force to effectuate the lawful BWI arrest of Mr. Sullivan that evening. I've got a couple of questions that would help me if you answer because you use a term about an arm lock and I don't understand what that is. I mean I saw I saw there's several CDs in the record and I haven't seen them all but I've seen some but I don't understand what an arm lock is. Does the record show that? Well an arm an arm bar an arm bar is simply a use of the hands to use a joint to direct the in any various way. It's it's a they train on it and that's how they use it they lock the joint and they pull the person. That's the use of an arm bar. So when you look at the at the DVD or whatever it is a CD one officer has each arm I mean so and they pull him out of the car and but then they say but he wasn't that whatever this lock was or block or he couldn't there wasn't any way he could catch himself right? Well because they've got hold of his arms. They they had control of his arms. The idea was they were going to go actually and the step is you go to your knee as you bring the suspect to the ground. That's the idea of the of the arm bar. Ultimately the suspect is going to the ground. That's absolutely correct. So and here so that the two problems from their standpoint is they have hold of his arms and he's apparently completely drunk. So he's if you read the cases the one thing that the cases focus on is whether the officers were aware of the fact that this person had diminished capacity. Well they clearly were aware of that and so that's I mean I'm not I'm I'm completely open to be candid about this case but the two things that are problematic is there wasn't any way he could catch himself if they've got his arms number one and number two they're aware of the fact that he's completely drunk. So I don't know I don't know whether that answers the legal questions in the case but factually I think that's I think there is no question that the suspect was intoxicated. They did a blood test following he was 224. The plaintiffs have filed a lawsuit alleging that he was over served at the bar. There's no question he was intoxicated that there and they knew it and they knew it. They've been called by the bar to tell him that's correct. They had. And so the question of course is that they're confronted with is how do we get this man from behind the wheel of the car. An admittedly dangerous situation. There's two other factors that bear on that. One is wisely. He had one of the officers pull what may have been a her but anyway a car in front of he wasn't going anywhere. And number two why do they not take the keys away. Those are fair questions. And in fact they did ask the suspect for the keys and he wouldn't give them to him. That was an order directed to him. And absolutely they put a car in front of Mr. Sullivan's pickup wisely of course to to to try to limit the effect of him driving off. But I I do have to disagree with the court that he couldn't drive off. I mean if you see that pickup in comparison to a police cruiser we believe that it's reasonable that he might have tried to get away. He could have busted his way through there. It's a big pickup and that could have been a situation that would have been even worse than where they were. The record reflect whether at the time that they pulled him that the engine was running at that point in time the engine was off but the keys were still in the ignition and under his control. And again until the officers either get him out of the car or get those keys away from him. Our our belief is that he has the control over that vehicle and it's still a dangerous situation that they can. He can turn it on whether he's successful or not. He has control of a deadly weapon. You know in an evaluating of course responses to resistance we start with Graham and we know that an officer has some right to use some force in effectuating an arrest. And the other thing is of course that you have to decide what the conduct is or what the crime is. DWI is a serious crime. DWI kills thousands of people in this country every year. In fact this court has noted that intoxicated drivers are a grave threat to the public. Mr. Sullivan was intoxicated. He was behind the wheel of a car. He was in control of it. In 2014 the Round Rock Police Department made three hundred and thirty one DWI arrests. This was one of them. The video of Mr. Sullivan confirms as you just noted that he was intoxicated. He was heavily intoxicated. And in evaluating the conduct of the officers you have to look at the resistance. And clearly the refusal to respond to verbal commands by an officer can be considered by the officer in evaluating the use of force. This comes from the DeVille versus Mercantile case that I know you're quite familiar with. And both sides have cited it in this action. We've cited it for the proposition that I've just stated. But the case has been carried forward in Carroll versus Ellington. The Fifth Circuit had a situation where a suspect was in a fight. They were chasing him. He sat down on a couch. They ordered him to get on the ground. And he wouldn't. And the officer used a taser. And the court said that whether an officer's application of a taser to an unarmed and seated suspect who fails to comply with an order to get on the ground is not a violation of the law. It's not objectively unreasonable under clearly established law. Given that, I don't believe that this court can say that it's objectively unreasonable under clearly established law for an officer to use his hands in the tactic that they did to use an arm bar to remove a seated DWI suspect who's failed multiple commands from his unsearched cab. Now, DeVille is heavily relied on by the athletes. And at first reading, it looks like it's a good case for them. But after a closer read, I believe it's as different as night and day, literally. Mrs. DeVille was taking her granddaughter home in the evening. Suggests that it was in the light of day. Mr. Sullivan, it was 3.30 in the morning. He was in a bar, a bar parking lot. The case in DeVille was a speeding ticket. She was going to be ticketed. Mr. Sullivan, it was a DWI case. There's no question he had to be arrested and taken to jail. In DeVille, it was a 10-mile-per-hour speeding ticket was not even a prosecutor. It was overturned. They found there was no probable cause. And in our case, again, it was a DWI, and Mrs. DeVille didn't get out of the car when the officers ordered her to, but there was a reason. She said she was waiting for her husband to come. She had her granddaughter in the car. Conversely, Mr. Sullivan here told the officers, I'm not getting out of the car, because if I do, you will arrest me. In fact, he should have known because he had been arrested about two months earlier. He told the officers that, you know, he closed the door on the officers. All of these factors that I mean, those actions of themselves could be a crime, could they not? Refusing the directions of the officers. Absolutely, that could be a crime. Maybe even resisting arrest. Yes, it could be. It could be a resisting arrest, but in DeVille, those charges were thrown out. They found that there was no probable cause for those charges, and they were fined. And in fact, as I understand Louisiana law, there is a right to resist unlawful arrest. All of those factors are different than what we have here in Sullivan. Our record, the material facts are not disputed about the level of Mr. Sullivan's resistance. By my count, Sullivan disobeyed over 20 commands to get out of the car, to turn over his keys, and to put his hands on his face. When you look at the video, there's one point where Mr. Sullivan begins dropping his hands from view, and the sergeant tells him, put your hands on your face. At least, by my count, 10 times or more. Of course, we know how important it is for an officer to be able to see a person's hands because that's where the danger comes from. Mr. Sullivan does not. He also, as I said, he told the officers he would not get out of the car because they would arrest him, and he's closed the door on Mr. Sullivan. How long from when the officer first got to the car and when he hit the ground? Less than five minutes. Well, and one of the things that a number of the cases, there's a lot of cases like this, unfortunately. One of the things that they talk about in dealing with drunk customers is the amount of time that the officer spent trying to talk the guy into doing something reasonable like getting out of the car. And the amount of time that was involved here is very small by comparison with most of those cases. They run 10 minutes or longer trying to . . . Well, I think, again, I don't know that there's any firm rule. I think . . . And I believe that we used a reasonable amount of time here to do that, to tell Mr. Sullivan. And, again, Mr. Sullivan, remember, he was more conscious in those cases because he told the officer, I'm not getting out of the car because if I do, you're going to arrest me. We know that he took a phone call when he's in the car. He's not passed out like some of these cases. He's conversant with the peace officer. He's listening to him. I think that makes a difference. And the same thing is, this pickup is huge. I mean, it's a deadly weapon. The other thing I wanted to talk about, I think that is very important, is the amount of force used. Judge King has raised a question about the force. But in thinking about it, I would point to the recent case of Pratt v. Harris County. Pratt v. Harris County, of course, is a case where it was an arrest after a traffic stop. It got aggravated, and the officers used a hog tie. And, sadly, the suspect expired. The Court goes through the history of hog ties, and they point out that there was no unconstitutional — there's no per se rule that a hog tie is unconstitutional, so they found that the officers were entitled to qualified immunity. I submit here, this case is like Pratt, there is no per se rule that using your hands in an armbar in this way to remove a suspect from a vehicle is a violation of clearly established law. I believe this is more like the Saucier v. Katz case, where the officers saw the man unfurl a banner at the vice president's rally, and they went over and they grabbed him, and they dragged him across the field, and they threw him into the patty wagon. This case is closer to that and deserves the same outcome. There's no deadly force here that appellees talk about, lethal force, near-lethal force, deadly force. Those are clear terms of art. And Justice Scalia reminded us that deadly force describes efforts, the direct force sufficient — as the direct force sufficient to kill the officers, the desired arrestee. The other thing that is, I think, most important for their case, the strongest point for their case, is obviously Mr. Sullivan expired, sadly, five months after the incident. But the Fifth Circuit has said that, you know, in that Pratt case, the officers cannot be held responsible for the unexpected, although tragic, results of their use of necessary force. At some point, they had to take Mr. Sullivan out of that car. He wasn't getting out. What was reasonable for those officers at that time and point in time, they had to get him out. He wasn't getting out. They could have waited all evening. There's no evidence that he was ever going to change his mind. They did use efforts to temper the force. They tried to negotiate with him to get out of the car. They say, we reacted too quickly. But in Poole v. The City of Shreveport, another DWI case, traffic case, they found that, you know, arrest is not a part or game. They gave them, said that 10 seconds was not too long, or they would not give a right of 10 seconds to provide the arrestee. So, in this case, we are asking that this Court reverse the trial judge summary judgment, denial of our summary judgment, grant a summary judgment in our favor, finding that each of these officers are entitled to qualified immunity based on the reasonableness of their actions, that no other reasonable officer would have known, or other reasonable officers could have known what they did, did not violate the Constitution or any clearly established right, and that they did not violate any clearly established rights. Thank you. Thank you, Mr. Thompson. You've saved time for rebuttal. Mr. Coon. May it please the Court. The officers asked the Court to grant them qualified immunity either by holding that the facts aren't what they appear to be or that the law does not say what it actually says. Sullivan never actively resisted arrest nor attempted to flee, but when he failed to fully comply quickly enough to their likings, the officers used extreme deadly force to pull Sullivan headfirst onto the pavement and curb, breaking his back and rendering him a quadriplegic and leading to his death. You say that he didn't comply quickly enough, and you can correct the record if Mr. Thompson has misrepresented it, but the record seems to indicate that he said, I'm not getting out because I know if I do, you're going to arrest me. What does that have to do with quickly enough? Well, when you look at the case, Your Honor, and you look at the footage and the video, what you'll see is he's given a number of commands. The first one is when they approach the vehicle, he's on the phone. He taps on the window and asks him to roll down the window. He does do that all the way. He asks him to get off his phone call. Well, in the case, the undisputed evidence in this case is that he had gone to this establishment with the promise, they promised him a ride home, and then after he stayed and drank excessively, they refused the ride home. So he told them he was going to go to the car and charge his phone to call for a ride. He was on the phone asking for that ride when the officer showed up. So the officer asked him to get off the phone. He complied and got off the phone. He continued to talk to the officer through this open window, standing as close as I am to the podium, and complied with many of the officer's orders. Now, the officer ordered him to get out of the vehicle, and in his intoxicated state, he believed, and it's clear from the video from what he says, that it was a trap, and if he stepped out of the vehicle, he would be arrested for public intoxication. So he said, no, I'm not going to get out because then you'll arrest me, and tried to engage the officer in dialogue. And as he did, in a matter of seconds, the officer, on several occasions, said, can I ask you a question? Can I ask you a question? The officer refused any dialogue. At that point, as soon as he did not step out of the vehicle, the officer immediately went to what he called the extraction. And to answer your question, Judge King, what is an arm bar? The evidence is clear in this case, and there's other cases that talk about it. An arm bar is where they twist the arm back and use pressure on the back of the elbow, in this case, to get the suspect to follow their command. And the way it's used, and Kirkham talks about it, who's our expert, is it's used with a controlled descent to the ground. That's the key in this case. The officers are trained to use the technique to force the person slowly, and as the opposing counsel just said, you're supposed to go to the knee then, as you control the descent to the ground. Now, in this case, we have a 350-plus pound man, clearly intoxicated, sitting in an elevated pickup truck. What the officers say on the video themselves is when, and it's 11 seconds from when they open the door, and your honor, he doesn't resist at any point when they open the door. The door's unlocked. When they open the door, he doesn't resist. They make these claims that he braced himself, he grabbed the steering wheel. None of that's on the video. It's not in their reports. What he did do was answer a phone call, which was his ride calling him back. And he said, hold on to the officer. Now, the officer took that, maybe it's impatience, maybe it's hubris, but his failure to immediately exit the vehicle in his drunken state, which, as the court knows, this kind of incident happens every single day. The officer grabbed his left arm, twisted it, and began the arm bar maneuver, which the officers said themselves on the tape later that they would debrief when they weren't being recorded, but that was a mistake because it forced him not to be able to shift his hips because it forces him forward. The other officer immediately reaches across the steering wheel, grabs his right arm that has the phone in it, right, and they want to say he grabbed, he used his arm to grab the steering wheel, but he actually had the phone in his hand. Grabbed that arm. Both officers extracted him using an arm bar technique, so it becomes a double arm bar technique. Both his arms are pinned back. They twist him. Now, in his drunken state, Judge Smith, I know that he does not comply, which I think this case is a huge distinction in here between active resistance and compliance, and I think that's key to the analysis. Given that you call it passive resistance or not complying, what should they have done to get him out of the car instead of this double arm bar? Right. And our expert talks about how they're trained in this and they repeatedly see it. In a highly intoxicated individual in this state, in most cases you can simply talk to the individual and they will comply, and that's exactly what the suspect was trying to do in this case. He repeatedly asked if he can talk to them. He's trying to explain what's going on here. He's trying to explain I was supposed to get a ride home. I'm calling for a ride home. The officer doesn't want to talk to him. The officer doesn't give him a chance to have that negotiation. In the video, Sergeant Zoss is extremely respectful, very calm, asks him numerous times, and again, as calm a voice as an officer can do, to exit the vehicle. You think there was not a willingness to? I don't think there was any willingness to talk, Your Honor, in the vehicle. I think the ultimatum was, and I think both sides were extremely calm. We don't make an allegation that the officers were irate. We make the allegation that the force they applied is unreasonable. Because what our expert talks about is what they're trained to do is they're trained to use negotiation, which the court talked about in numerous cases, but in the DeVille case, the court talked about how they jumped immediately to force. In the Chacon case, the court recently talked about how you have to use measured and ascending force in response to the force or resistance that's offered by the suspect. And in this case, there is no resistance ever offered. It's just noncompliance, which is a huge distinction. And so our expert talked about how they could have used a taser, they could have used the threat of it, they could have even used an armbar technique if they did it the way you would expect them to do it. A taser is more forceful than pulling someone out of a car. And the medical examiner in this case, the city's own medical examiner, said that he died from blunt force trauma, which was a result of a homicide. That's what the evidence is in this case. Using a taser, using a stun gun, anything would have been better, probably, other than using a pistol. But the point is that the court has talked about, I mean, there's a two-step analysis. The first is, it shouldn't... So you can see there was no evidence that the officers knew of his preexisting condition. He wasn't parked in a handicapped spot. I know there was the placard on the rearview mirror, but... They claim that they didn't know. I think that's probably a fact question for the jury to decide. They say it wouldn't have made... What evidence do you have that they knew? Well, there's a visible placard that's hanging right in front of them. He also had a visible back defect. It's the equivalent of a hunchback, Your Honor. You could see it in him. I mean, the evidence was, and they even say on the scene, that he would have had a hard time getting out of the car quickly anyway. The point is he wasn't given that opportunity in the state that he was in. And what the court talks about is, I mean, it's a two-step process. The first is, is there a constitutional right? And then whether or not the law was clearly established at the time. Now, the Supreme Court has clearly said over and over again that you have a constitutional right to be free from excessive force at the time of the arrest. And that's our dispute here, is whether or not they used excessive force. And if you look at what the court has looked at, the Graham factors, the severity of the crime, whether the suspect posed an immediate threat to the officers, and whether the suspect was actively resisting, all of those weigh in our favor in this case. And specifically, I wanted to talk about the active resistance, because Judge Costa, you talked about it and you wrote about it in the Coran decision. In that case, you said that the suspect's active resistance is the key or a key factor in the Fourth Amendment analysis of objective reasonableness. In that case, the officer, the claim was that the person fought with the officer, and her defense was, I didn't fight, I just jerked back, and he grabbed me and threw me into the wall. What you had in that case was the gratuitous throwing into the wall. And sort of like in the DeVille case that we've talked about, there was a gratuitous, I think, push into the car. Here, any force, the force that caused this problem was related to the objective of getting the person out of the car. But it was still gratuitous, Your Honor. They went from zero to 60. It served a purpose. It might have been too much force, but when you get to the clearly established part of the inquiry, what's your best case? Because the Supreme Court has repeatedly said you don't do it at this level of generality of there's a right under Graham. Let me finish. There's a right under Graham to be free from excessive force. So it has to be more specific than that. Not a case right on point, but more specific than a general right. What's your best case? Right. I think DeVille is probably the single best case. In that one, the individual had every opportunity to get out. They specifically refused to get out. He wants to say it was only speeding. She was actually also charged with driving under a controlled substance. She refused to get out. There was a child in the car. The car was still running. The keys were in the ignition. In this case, when they asked him and they gave him, they shouted multiple orders at the same time. When they ordered him to turn the vehicle off, he turned it off. It was trapped in on both sides. There was no threat of flight in this case. He was trying to negotiate with them. DeVille, they weren't trying to negotiate. She refused to negotiate. She refused to get out. I also would look at the Doss case, which talked where the agent pulled him out and there were varying stories about the level of force that was used. And then the final case I wanted to share with you is the Davis v. Clifford case that the Tenth Circuit just came out with in June. I didn't cite it in my response to his 28-J letter, but it's 2016 WL3244835. And in that case, the Tenth Circuit, relying on DeVille, held that the individual stated a claim for unreasonable excessive use of force where the officers surrounded the car, told her to get out. She refused to get out unless the officers would guarantee her her personal safety. They broke the window, extracted her, and threw her to the ground. I mean, there's a series of cases, and I can't even do them all justice when I talk about what cases establish the reasonably established part of it, Your Honor, because Do you think there's evidence that they threw him to the ground here? Exactly, Your Honor. As opposed to pulling him out and he fell and hit the ground? Well, I think There's a difference of intentionality. I think so, Your Honor, because when the force that's required His hips haven't shifted. The force that is required to turn his body and pull him down is all of their might. And you can see Officer Zoss actually flies backwards when he pulls him out because they used all their body weight to pull him out and keep his arms from catching himself. At that point, I don't believe this is simply And they make this argument that he accidentally fell out of the vehicle, right, that they were trying to escort him from the vehicle and he fell. That clearly is not supported by the videos, and a jury can decide that issue. But I think under clear precedent, the idea of the level of force they used I mean, think about the rule that they want to create. The rule that they say is that they showed up and they had reason to arrest him. We don't dispute that. The rule they say is we gave him a lawful order to exit the vehicle, and he refused. At that level, at that point, any physical force we use to obtain an arrest is lawful. That's their argument. That has been soundly rejected by the courts over and over and over again. And when they make the comparisons they do, the analysis to the case where the protester is pushed and claims that that's an injury, compare that to the facts of this case. In this case, in the Carone case, Your Honor, she had a bruised head. In this case, he had a severed spine. The force that was required, and that's what our expert talks about, when you throw a person to the ground, and the Seventh Circuit case also, I should point out, which is in the briefing, and that's the Phillips case. You know, the Phillips is the shooting case. There's another case in the Seventh Circuit that's cited where they say that the argument that an officer could throw a person with the full force and weight of their body to the pavement, right, to secure when they're not actively resisting is completely unreasonable and atrocious. I mean, if this is the law, if we create this rule, every stop in which the person does not immediately consent, then they're going to be subject to deadly force. And deadly force has been defined as force that has a substantial likelihood of causing death or substantial injury. Where do you get the word immediately from this record? I don't understand how you pull that word out of thin air. We've been here talking about the record and about the discussion that went on and how many commands he failed to obey or disobeyed in the discussion between him and the officer. I mean, it's easy for you to use the word immediately, but that's not justified by anything in the record that we have. I think it is, Your Honor, in the fact that when they showed up, that until the time they extracted him was two minutes. From the time that he told him, and you shorten that when you go to the time that he actually told him to exit the vehicle, right, there was this beginning discussion where they were simply just talking back and forth. And when you look at what the police officers did, you had the initial conversation, right, and then their first choice of force is this policy, this extraction. That's what they used. He didn't comply. And, again, there's a huge difference. And the court talked about this in the Bone case that we cite in our response to their 28-J, that when we look at the officer's actions, when we're talking about a misdemeanor suspect, that when the suspect is not actively resisting, and they say and trying to flee, then we hold the officer as not entitled to qualified immunity. And in that case, all we have is an officer pushing the suspect up against the wall, and she bumped her head. And he wants to make the distinction where he says in that case the crime was less severe. They were arrested in that case for disturbing the peace by tumultuous behavior in violation of New Orleans ordinance that prohibits, quote, acting in a violent or tumultuous manner toward another whereby the property of a person is placed in danger or destroyed or damaged. That is a much more violent situation the officer was called into. In that case, someone in the French Quarter was throwing trash on top of another vehicle. The officer showed up to this what could have been a huge fight. Again, there's the push into the wall, which is just, at least in the plaintiff's favor, is just a purely sadistic act. But what evidence in the record, is it just the video that you're relying on to create a fact issue that this was actually a shove or push onto the ground? Well, I would describe it as a pull, right? It's a pull and a pivot, like when they trim the arms back. And it's admitted that they used this double arm bar technique. It's admitted in the record that he didn't resist at all. The officer said so at the scene repeatedly. They admitted that there wasn't a protracted fight, Judge Smith, on the record they said, that all it was was us pulling him out and he didn't fight. Officer Ballou, during the arrest, said yellow. He called out a yellow code, which is to use the stun gun, the taser. And they asked him afterwards why you did that. And he said, well, I thought he was going to lock up, and I was calling for it so you could shock him so he wouldn't be able to lock up. But then I saw he wasn't doing that, so I realized we didn't need it. So, I mean, the evidence in the case, and the officer said over and over again that he didn't fight, right? So the point is you have an intoxicated and inebriated, severely, individual who doesn't actively resist. He just fails to comply. And if we begin to blur the idea of lack of compliance with active resistance to justify accelerated force, then that completely changes the law. I mean, and I think I gave the Court the Tenth Circuit decision, the Seventh Circuit decision, this Court's DeVille decision. I mean, there's been several of them. The act of not complying with the officer's order gives the officer the right, of course, to use some force. The question is what level of force. And the cases have repeatedly said it can't be excessive physical force. What should have happened in this case is they should have negotiated, right, which is what the suspect was trying to do, right? Then they could have used the arm bar technique properly. And that's not to bring it as a malpractice or negligence case. They just, the force they applied was different than what they could have applied. How do you read the district court's opinion on this? Did he, in your view, deny qualified immunity or just say I'm going to decide at a trial? He denied a summary judgment on qualified immunity. He was actually trying to be more forgiving to them in saying, I think his intention was to say, look, I'll revisit this, but he was intending to deny it on summary judgment because he believed that there were fact questions, which is clear, and credibility questions, which this court has talked about in Bone, in the Schmidt case. The court case law say when you're dealing with multiple defendants, and here I think you've got three officers, that in a qualified immunity analysis you have to assess the immunity specifically for each defendant? Well, it talks about when they act together, you can consider it together. And in this case they agreed that they had a plan that they coordinated together. But the district court didn't say they acted together or analyzed it. He just said there's fact questions. There's fact questions. Yes, Your Honor. And I think he just looked at the scenario and said, you know, their claim at trial was this was an accident. We were leading him out and he fell and he was accidentally injured. And the court looked at the video and said that clearly is not true.  Which is what this court and, in fact, in Graham, the Supreme Court said, right, whose version is true. And I think the danger here is the rule they're asking you to create. This court has repeatedly and most recently in Bone, three weeks ago, said that you can only use accelerated force and be entitled to summary judgment when there is active resistance. There is absolutely no active resistance in this case, and you can't blur the word compliance with active resistance without seriously distorting Fourth Amendment law. Well, but the problem with that analysis, I mean, I don't hear that they're urging that particular rule, but we can always ask them. But it seems to me that if that rule is true that you just enunciated, then a suspect could just sit in that seat in the pickup truck forever because no force would ever be justified. Can I respond, Your Honor? Yes, sure. I don't think that's true at all, Your Honor, because we have never said, and the law doesn't say, that the officer can't use force. They obviously can use force. But the analysis requires them to use measured force in response, as the court said in Chacon, to the active resistance of the defendant. And so in the early stage, what the court talks about in DeVille is that a juror could find, in the end, the reasonableness is going to be a jury determination. A juror could clearly find that even though the suspect clearly refused to comply, that the officers did not use negotiation for long enough. So that would be the first step. Then they could find that they didn't use less forceful means. What our expert has said in this case is that the force that they applied, this double armbar technique, taking a man from an elevated pickup truck headfirst into a curb, is a rogue tactic not taught anywhere in the nation, and that the entire attempt of these seizures, police are taught to use control to take the suspect to the ground. All right. Thank you, Mr. Coon. Mr. Thompson, you've saved time for rebuttal. May I please report again? Just a few quick points. One, the medical examiner, his opinion actually says that the decedent died as the result of complications of blunt force trauma with a significant contributing factor of angulizing spondylitis. There's no evidence that the officers knew Mr. Sullivan had this debilitating preexisting condition. We do not agree. I gather from, I guess I sort of infer from the record, Mr. Coon made the statement that Mr. Sullivan might have, because of his debilitated condition, might have had difficulty climbing out of the pickup. But can we infer from the record that he obviously had no difficulty climbing up into this elevated pickup and getting himself properly seated in the front seat and ready to drive off? Yes. I mean, he'd been in and out of the bar that night, out of that pickup. So he'd gotten down, presumably, I mean, we don't have a video of it, but he had gotten out of the pickup truck and had gotten into the bar on his own and had come back up and had climbed back. So climbing up into the pickup, if you're that overweight and you have this physical condition, would be more difficult than getting out of it, I assume, gravity being what it is. I think that's probably right. I think that's probably right. And, again, you know, they talk about the use of the double arm bar, and they say that it would have been appropriate to use a single arm bar in this situation. Well, if you look at the record and you look at the video, in fact, that's what happened. Officer Mayo is called to the scene, and Sergeant Mayo says, extract, and so she goes to try to pull over her head this man who's 360 pounds out of this deadly force, the pickup truck. And as she pulls him, she can't move him. She's not using excessive force. She can't even use enough force to get him out. She has to pull once, twice, maybe three times, and doesn't even move the man. He's not helping to get out. He's just there. And then Sergeant Zoss sees the situation. They have to get him out of the car, and so he goes around to get the other arm. And together they bring Mr. Sullivan to the side of the car, and they all fall out together. There is no doubt that the officers intended to take Mr. Sullivan out of that car, and they were going to take him out of the car. There's no doubt about that, and it's reasonable for them to do that. He was a DWI suspect, and as this court has noted in the Poole case, as I said earlier, an arrest is not a parlor game. Sometimes when a person does not follow the officer's orders, they have to use force in order to effectuate the arrest, and the force here was not excessive. The force here did not violate clearly established law. And, in fact, they did try to negotiate, and they tried to use the armbar properly, and they tried to reason with this man in order to get him to get out of the car. They didn't want him. They didn't want to pull him out of the car. No officer wants to pull somebody out of a car. They hoped he would get out of the car on his own. He didn't. They had to respond to his resistance, and that's what they did. Now, at the end of the day, officers have qualified immunity for various reasons. You know, public officials, they need to be shielded from personal liability so that they have reasonable room to do their job, and that even includes the occasional wrong mistake if the mistake is reasonable.  But if it was, it was a reasonable mistake of both the fact and the law. There's no clearly established law that would have prevented them from their action. At the end of the day, I think that Justice Rehnquist pointed it out in his case in Roberts v. Luciana, policemen on the beat are exposed in the service of society to all the risks which the constant effort to prevent crime and apprehend criminals entails. Because these people are literally the foot soldiers of society's defense of ordered liberty, the state has a special interest in their protection. Or, as Justice Costa put it recently in Pratt v. Harris County, it is precisely for such situations when the existence of a constitutional violation is not beyond debate that qualified immunity provides a defense. I suggest this is such a case, and we ask the Court to reverse and render judgments for each of my clients, Sergeant Zoss, Officer Mayo, and Officer Ballew. All right. Thank you, Mr. Thompson. Your case is under submission. The final case for today.